UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

BRUCE DESISTE,

                              Plaintiff,

                    -v.-

SOLOMON SOBANDE,

                              Defendant.

---

20 Civ. 6947 (KPF)

**OPINION AND ORDER**

KATHERINE POLK FAILLA, District Judge:

　　Plaintiff Bruce Desiste brings this action against Defendant Solomon Sobande for breach of a profit-sharing agreement that Plaintiff claims the parties entered into after he introduced Defendant to two emerging artists: the late rapper Jahseh Dwayne Ricardo Onfroy, known professionally as "XXXTentacion" ("Onfroy"); and Stokely Clevon Goulbourne, known professionally as "Ski Mask the Slump God" ("Goulbourne").  Plaintiff claims that, under the terms of the alleged agreement, Defendant owes Plaintiff 20% of Defendant's earnings from his management of Onfroy and Goulbourne. Defendant denies ever entering into such an agreement with Plaintiff.

　　Now before the Court is Defendant's motion for summary judgment.  For the reasons that follow, the Court finds that there is a genuine dispute of material fact as to whether an enforceable profit-sharing agreement existed between the parties, and thus denies Defendant's motion for summary judgment.

<h2 style="text-align:center">BACKGROUND[1]</h2>

**A.    Factual Background**

The parties' submissions are rife with factual disputes.  This section
notes the few facts on which the parties agree and specifies where their
understandings diverge.

### 1.    The Relationship Between the Parties

Plaintiff is an aspiring rapper and recording artist known professionally
as "Kridakal" or "Krida."  (Pl. 56.1 ¶ 1; Def. Counter-56.1 ¶ 69).  Defendant is
an artist manager and the co-founder and CEO of Sounds Music Group, Inc.
(Pl. 56.1 ¶¶ 2, 6).  The two men attended the same high school.  (Def. Counter-
56.1 ¶ 67).

---

[1]    The facts set forth in this Opinion are drawn from the parties' submission in connection
with Defendant's motion for summary judgment.  The Court draws primarily from
Defendant's Local Civil Rule 56.1 Statement of Material Undisputed Facts (Dkt. #42
("Def. 56.1")), Plaintiff's Response to Defendant's Local Civil Rule 56.1 Statement and
Statement of Additional Material Facts pursuant to Local Civil Rule 56.1(b) (Dkt. #59
("Pl. 56.1")), and Defendant's Local Civil Rule 56.1 Counterstatement of Material
Undisputed Facts (Dkt. #67 ("Def. Counter-56.1")).  Citations to a party's Rule 56.1
Statement incorporate by reference the documents cited therein.  In addition, "[e]ach
numbered paragraph in the statement of material facts ... will be deemed to be admitted
for purposes of the motion unless specifically controverted by a correspondingly
numbered paragraph in the statement required to be served by the opposing party."
Local Civil Rule 56.1(c).

The Court sources additional facts from the declarations submitted by the parties and
the exhibits attached thereto, including Defendant's declaration in support of his
motion for summary judgment (Dkt. #45 ("Def. Decl.")), Plaintiff's declaration in
opposition to Defendant's motion for summary judgment (Dkt. #54 ("Pl. Decl.")),
Defendant's declaration in further support of his motion for summary judgment (Dkt.
#69 ("Def. Reply Decl.")), the declaration of Defendant's expert Jordan Mills (Dkt. #46
("Mills Decl.")), the declaration of Robert Celestin, Esq., in support of Defendant's
motion for summary judgment (Dkt. #70 ("Celestin Decl.")), and the March 14, 2017
email and attachment that purportedly constitutes the agreement at issue in this case
(Dkt. #54-5).  Other facts sourced from the declarations and their accompanying
exhibits are cited using the convention "[Name] Decl., Ex. [ ]."

For ease of reference, the Court refers to Defendant's brief in support of his motion for
summary judgment as "Def. Br." (Dkt. #43), to Plaintiff's opposition brief as "Pl. Opp."
(Dkt. #58), and to Defendant's reply brief as "Def. Reply" (Dkt. #68).

2

In or around 2015,[2] Plaintiff began visiting a recording studio that Defendant operated out of his mother's home in Elmont, New York.  (Pl. 56.1 ¶¶ 4, 12).  On several occasions, Defendant permitted Plaintiff to record his music at the Elmont studio for free.  (*Id.* at ¶¶ 12, 14).  Defendant also helped Plaintiff book shows and promote his music by connecting him with agencies and marketing professionals.  (*Id.* at ¶ 16).  Plaintiff asked Defendant to manage his music career multiple times, but Defendant declined.  (*Id.* at ¶ 17).  The two became friends and communicated often.  (Def. Counter-56.1 ¶ 70).

### 2.    Defendant's Management of XXXTentacion and Ski Mask the Slump God

The parties also dispute many of the facts surrounding Defendant's introduction to and eventual management of Onfroy and Goulbourne.  They agree on three points: (i) Plaintiff gave Defendant the phone number of Onfroy's friend, Christian Gotay, in or around 2016 (Pl. 56.1 ¶ 27); (ii) Gotay connected Defendant with Onfroy (*id.* at ¶ 28); and (iii) Defendant signed management agreements with both Onfroy and Goulbourne in early 2017 (*id.* at ¶¶ 36, 40).  They differ as to almost everything else.

The Court begins with Plaintiff's point of view.  Plaintiff takes credit for introducing Defendant to Onfroy and Goulbourne.  He claims that he recognized the artists' musical potential after meeting them at Gotay's home in Fort Lauderdale, Florida, in 2015.  (Pl. 56.1 ¶¶ 73-76).  Plaintiff recalls

---

[2]    Plaintiff maintains that he began visiting the Elmont studio between 2012 and 2014. (Pl. 56.1 ¶ 68).  Defendant believes that their first formal meeting was not until 2015. (Def. Counter-56.1 ¶ 68).  Because the events that form the basis of this suit occurred in 2015 and later, this dispute is not material.

speaking with both Gotay and Defendant on multiple occasions in 2015 and 2016 about the possibility of Defendant managing Onfroy and Goulbourne.  (*Id.* at ¶¶ 80-89).  Plaintiff reports that Defendant was unfamiliar with the artists and initially did not like their music (*id.* at ¶¶ 83-85), but changed his mind after Onfroy began receiving popular attention following his October 2016 arrest (*id.* at ¶¶ 92-95).  At Defendant's insistence, Plaintiff facilitated Defendant's introduction to Onfroy by connecting him with Gotay.  (*Id.* at ¶¶ 95, 98-101).  Plaintiff and Gotay then arranged for Defendant to visit Onfroy in a Florida prison on January 28, 2017.  (*Id.* at ¶ 102).  Defendant signed a management agreement with Onfroy during that visit.  (*Id.* at ¶ 103).

Plaintiff also purports to have played a key role in introducing Defendant and Goulbourne.  Plaintiff avers that in January 2017, Defendant expressed interest in managing Goulbourne (Pl. 56.1 ¶ 105), and texted Plaintiff "get ski mask" and "Let's make Ski Mask a star" (Pl. Decl., Ex. 1).[3]  Plaintiff claims to have facilitated their introduction by calling Defendant on several occasions while with Goulbourne so that the two could chat.  (Pl. 56.1 ¶ 108).  Defendant began managing Goulbourne in February 2017.  (*Id.* at ¶ 109).

Defendant recalls those events differently.  He maintains that he was aware of Onfroy's talent before hearing about him from Plaintiff.  (Def. 56.1 ¶ 26).  Although Defendant acknowledges that Plaintiff connected him with Gotay, he claims to have developed an independent relationship with

---

[3]     Defendant denies sending those texts to Plaintiff.  (Def. Counter-56.1 ¶ 106).

Gotay that eventually led Gotay to introduce him to Onfroy.  (*Id.* at ¶¶ 27-28).
Defendant says that he invested significant time building relationships with
Onfroy and his mother, Cleopatra Bernard, and arranged his own travel to
Florida to sign the management agreement with Onfroy.  (*Id.* at ¶¶ 30-36; Def.
Counter-56.1 ¶ 102).

Defendant also denies that Plaintiff played a role in facilitating his
professional relationship with Goulbourne.  (Def. Counter-56.1 ¶ 108).
Defendant avers that he introduced himself to Goulbourne by direct messaging
him on Instagram.  (*Id.*).  In Defendant's view, Goulbourne signed with
Defendant because he was aware of Defendant's work with Gotay.  (Def.
56.1 ¶¶ 39-40).

### 3.    The Alleged Profit-Sharing Agreement Between Plaintiff and Defendant

The present dispute stems from the breach of an alleged agreement
between Plaintiff and Defendant to share the profits of Defendant's work with
Gotay and Goulbourne.  Here, too, many of the operative facts about that
agreement are disputed.

Again, the Court begins with Plaintiff's point of view.  According to
Plaintiff, he and Defendant discussed entering into an agreement whereby
Plaintiff would introduce Defendant to Onfroy and Goulbourne and assist with
their representation in exchange for 20% of Defendant's gross commissions
from managing the artists.  (Pl. 56.1 ¶¶ 96-97).  After Plaintiff made the
introductions and Defendant signed management agreements with the two
artists, Defendant sent Plaintiff a blank W-9 form, which Plaintiff completed

and emailed to Defendant on March 5, 2017.  (Pl. Decl. ¶¶ 34-36; *id.*, Ex. 2).

On March 6, 2017, Defendant provided Plaintiff a printed copy of a draft profit-

sharing agreement memorializing the previously agreed-upon terms, and

emailed[4] Plaintiff a copy of the same the next day.  (Pl. Decl. ¶¶ 37-38; *id.*,

Ex. 3).  The parties texted about the draft agreement on March 8, 2017:

> [Defendant]: Emailed you profit sharing agreement
> bring me 2 copies and let's sign.
>
> [Plaintiff]: gotta go over it before I sign bro
>
> [Plaintiff]: But let's do it
>
> [Defendant]: Of course
>
> [Defendant]: I was gonna go over it with you if there was
> stuff you didn't understand
>
> [Defendant]: But I made sure there was provisions to
> protect your % no matter what happens to my deal.
>
> [Plaintiff]: Kopy

(Pl. Decl., Ex. 4).

Plaintiff recalls signing the profit-sharing agreement together with

Defendant at Defendant's home on March 14, 2017.  (Pl. 56.1 ¶ 121).  Plaintiff

electronically signed the agreement on Defendant's phone using DocuSign.  (*Id.*

at ¶ 122).[5]  Defendant did the same immediately afterwards.  (*Id.* at ¶ 124).

---

4       The emails referenced in this section were sent from solomon@soundsmusicgroup.com.
(Pl. Decl., Ex. 2-3, 5).  Although Defendant denies sending any emails regarding the
purported profit-sharing agreement, he admits that this is his email address.  (Def.
Decl. ¶ 8).

5       DocuSign is a software that allows parties to electronically sign documents and
agreements on a variety of devices.  A document signed electronically using DocuSign is
as legally binding as if it were signed in ink.  *See* N.Y. Tech. Law § 304(2).  Digital

Later that evening, Plaintiff received a copy of the executed agreement from Defendant's email address.  (Pl. Decl. ¶ 50; *id.*, Ex. 5).

For his part, Defendant is adamant that he never entered into a profit-sharing agreement with Plaintiff.  (Def. Reply Decl. ¶ 9 ("[A]t no time did I discuss with Plaintiff any type of commission sharing arrangement[.]  When Plaintiff provided me with Gotay's contact information, he did so willingly and without any strings attached.")).  Defendant denies sending Plaintiff a W-9, though he admits to receiving one from Plaintiff through an associate.  (*Id.* at ¶ 17 n.4; Def. Counter-56.1 ¶ 111).  He also denies sending Plaintiff the draft agreement, texting Plaintiff about the draft, signing the agreement, or emailing Plaintiff the executed agreement.  (Def. Decl. ¶ 44; Def. Reply Decl. ¶ 17).  Defendant suggests that any emails from his account were sent by Plaintiff himself, who had access to Defendant's computer and iPhone at the Elmont studio.  (Def. Reply Decl. ¶ 17).  Plaintiff denies sending any emails to himself from Defendant's account.  (Pl. Decl. ¶ 35).

According to Plaintiff, Defendant largely complied with their agreement until May or June 2017.  He maintains that Defendant kept him in the loop on Onfroy's and Goulbourne's professional activities.  (Pl. 56.1 ¶ 133).  In connection with the instant litigation, Plaintiff produced screenshots of text messages in which Defendant alluded to paying Plaintiff a portion of revenues from his representation of the artists (*id.* at ¶ 139), including an April 21, 2017

---

signatures contain encrypted data that enables later authentication of a signatory's identity.  (Mills Decl., Ex. B).

7

text stating, "Getting the money in 72 hours. Giving you 5k." (Pl. Decl., Ex. 9); an April 25, 2017 text message stating, "Good news.  Money came in … Just want you to know that all that money and you still gonna be ugly," followed by a smiling emoji (*id.*, Ex. 10); a May 8, 2017 text stating, "Working on getting this deposit for camp flognogg.  Might have some bread for you today." (*id.*, Ex. 11); and an undated message stating, "When Ski get paid for his Merch deal you will get $$" (*id.*, Ex. 13).  Defendant denies sending these messages. (Def. Reply Decl. ¶ 22).

The parties do agree, however, that Defendant paid Plaintiff during this period.  Plaintiff claims that Defendant paid him a total of $40,000 in the first half of 2017, including two $5,000 payments, a $10,000 payment, and a $20,000 payment.  (Pl. Decl. ¶¶ 65-67).  Plaintiff further asserts that the timing of the first $5,000 payment coincided with Defendant's receipt of a commission from Onfroy's 2017 deal with Empire Records (*id.* at ¶ 66), and that Defendant told him that the $20,000 payment was being made pursuant to their agreement (*id.* at ¶ 67).  Defendant admits to paying Plaintiff a total of $33,000 (a $3,000 payment, a $10,000 payment, and a $20,000 payment), but maintains that the money was merely an informal means of thanking Plaintiff for connecting him with Gotay and did not evince a contractual obligation. (Def. Decl. ¶¶ 40-41).  Defendant further denies any correlation between Onfroy's Empire Records deal and his payments to Plaintiff.  (Def. Counter-56.1 ¶ 147).  Both sides agree that Defendant did not make any payments to Plaintiff after May or June 2017.  (Pl. 56.1 ¶ 43).

In December 2017, and again in January 2018, Plaintiff contacted Onfroy's attorney Robert Celestin about Defendant's alleged non-compliance with the agreement. (Celestin Decl. ¶¶ 9-10). Celestin advised Plaintiff to contact Defendant directly. (*Id.* at ¶ 10). In late 2018, Plaintiff retained counsel to pursue a breach of contract claim against Defendant. (Def. Counter-56.1 ¶ 169).

## B. Procedural Background

Plaintiff commenced this action by filing a complaint against Defendant on August 27, 2020. (Dkt. #1). Defendant filed an answer on October 6, 2020. (Dkt. #9). On November 19, 2020, the Court held an initial pretrial conference (*see* Minute Entry for Nov. 19, 2020), after which it entered a case management plan and scheduling order, setting an April 19, 2021 deadline for fact discovery and a June 3, 2021 deadline for expert discovery (Dkt. #13). Upon application of the parties and for good cause, the Court subsequently extended the discovery deadlines four times between April 14, 2021, and September 2, 2021. (Dkt. #18, 20, 27; Minute Entry for Sept. 2, 2021).

The Court resolved several discovery disputes during this period. First, following a telephonic conference on June 16, 2021, the Court ordered Defendant to produce discovery showing gross receipts received from Onfroy and Goulbourne during the relevant period. (Dkt. #24). Then, on August 24, 2021, following written argument from the parties, the Court ordered Defendant to produce an agreement between Defendant and Onfroy's mother, Cleopatra Bernard, that purportedly related to Defendant's management

agreement with Onfroy.  (Dkt. #31).  Plaintiff subsequently renewed his request for discovery related to commissions that were earned by Defendant after Onfroy's June 18, 2018 death for work released prior to the death.  After hearing argument at a September 2, 2022 conference, the Court found those documents to be beyond the scope of the litigation and denied Plaintiff's request.  (Dkt. #35).  Fact discovery closed on August 18, 2021, and expert discovery closed on October 4, 2021.  (Dkt. #27; Minute Entry for Sept. 2, 2021).

On September 2, 2021, the Court referred the case to Magistrate Judge Ona T. Wang for a settlement conference.  (Dkt. #34).  On November 3, 2021, Defendant filed a letter seeking a conference regarding his anticipated motion for summary judgment.  (Dkt. #38).  The Court dispensed with its usual requirement of a pre-motion conference and set a briefing schedule for Defendant's motion, though it directed the parties to participate in the upcoming settlement conference in good faith.  (Dkt. #39).  A settlement conference was held before Magistrate Judge Wang on November 30, 2021. (Minute Entry for Nov. 30, 2021).  Settlement efforts were unsuccessful.

Defendant filed his motion for summary judgment and supporting documents on December 13, 2021 (Dkt. #41-46), as well as a motion for oral argument (Dkt. #47).  Also on December 13, 2021, Plaintiff voluntarily dismissed his claim of breach of contract based on an oral agreement, but reserved the right to introduce evidence of an oral agreement for purposes other than enforcing that agreement.  (Dkt. #49).  Plaintiff filed his opposition

to the summary judgment motion and supporting documents on January 27, 2022, portions of which were refiled on February 9, 2022, to include a redacted version of an exhibit that was filed under seal.  (Dkt. #54-59, 64).  On February 15, 2022, Defendant requested an extension of time to file his reply (Dkt. #65), which request the Court granted the same day (Dkt. #66). Defendant filed his reply and supporting documents on February 25, 2022. (Dkt. #67-72).  Accordingly, Defendant's motion is fully briefed and ripe for the Court's consideration.

## DISCUSSION

### A.   Applicable Law

#### 1.   Summary Judgment Under Federal Rule of Civil Procedure 56

Under Federal Rule of Civil Procedure 56(a), a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp.* v. *Catrett*, 477 U.S. 317, 322 (1986).[6]  A fact is "material" if it "might affect the outcome of the suit under the governing law," and is genuinely disputed "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

---

[6]     The 2010 Amendments to the Federal Rules of Civil Procedure revised the summary judgment standard from a genuine "issue" of material fact to a genuine "dispute" of material fact.  *See* Fed. R. Civ. P. 56, advisory comm. notes (2010 Amendments) (noting that the amendment to "[s]ubdivision (a) ... chang[es] only one word — genuine 'issue' becomes genuine 'dispute.'  'Dispute' better reflects the focus of a summary-judgment determination.").  This Court uses the post-amendment standard, but continues to be guided by pre-amendment Supreme Court and Second Circuit precedent that refer to "genuine issues of material fact."

While the moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact," *Celotex Corp.*, 477 U.S. at 323, the party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co.* v. *Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *see also Brown* v. *Henderson*, 257 F.3d 246, 252 (2d Cir. 2001).  Rather, the non-moving party "must set forth specific facts showing that there is a genuine issue for trial." *Parks Real Estate Purchasing Grp.* v. *St. Paul Fire & Marine Ins. Co.*, 472 F.3d 33, 41 (2d Cir. 2006) (quoting Fed. R. Civ. P. 56(e)).

"When ruling on a summary judgment motion, the district court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Dallas Aerospace, Inc.* v. *CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003).  In considering "what may reasonably be inferred" from evidence in the record, however, the court should not accord the non-moving party the benefit of "unreasonable inferences, or inferences at war with undisputed facts." *County of Suffolk* v. *Long Island Lighting Co.*, 907 F.2d 1295, 1318 (2d Cir. 1990)).  Moreover, "[t]hough [the Court] must accept as true the allegations of the party defending against the summary judgment motion, ... conclusory statements, conjecture, or speculation by the party resisting the motion will not defeat summary judgment." *Kulak* v. *City of New York*, 88 F.3d 63, 71 (2d Cir. 1996) (internal citation omitted) (citing *Matsushita*, 475 U.S. at 587).

### 2.     Breach of Contract Under New York Law

"Under New York law, the elements of a claim for breach of contract are '[i] the existence of an agreement, [ii] adequate performance of the contract by the plaintiff, [iii] breach of contract by the defendant, and [iv] damages.'" *Abraham* v. *Leigh*, 471 F. Supp. 3d 540, 556 (S.D.N.Y. 2020) (quoting *Harsco Corp.* v. *Segui*, 91 F.3d 337, 348 (2d Cir. 1996)); *see also Canzona* v. *Atanasio*, 989 N.Y.S.2d 44, 47 (2d Dep't 2014).

Defendant seeks summary judgment on the first element, denying that he and Plaintiff ever formed a contract.  "Mutual assent is essential to the formation of a contract[.]"  *Maffea* v. *Ippolito*, 668 N.Y.S.2d 653, 654 (2d Dep't 1998) (citing 22 N.Y. Jur. 2d, Contracts, § 29).  Assent can be manifested "by word, act, or conduct which evinces the intention of the parties to contract." *Id.*  To determine the existence of mutual assent, courts consider the totality of the circumstances, including "the situation of the parties, and the objectives they were striving to attain."  *Brown Bros. Elec. Contractors, Inc.* v. *Beam Const. Corp.*, 41 N.Y.2d 397, 400 (1977).  A writing signed by the parties is powerful evidence of assent.  *Choung* v. *Allstate Ins. Co.*, 724 N.Y.S.2d 882, 882 (2d Dep't 2001) ("A party who executes a contract is presumed to know its contents and to assent to them."); *see also Nusbaum* v. *E-Lo Sportswear LLC*, No. 17 Civ. 3646 (KBF), 2017 WL 5991787, at *3 (S.D.N.Y. Dec. 1, 2017) ("A signed writing can serve as evidence of mutual assent.").

But a signed writing is not necessary to contract formation.  "Under New York law, parties are free to enter into a binding contract without

13

memorializing their agreement in a fully executed document." *Barshay* v. *Naithani*, No. 20 Civ. 8579 (KPF), 2022 WL 170599, at *1 (S.D.N.Y. Jan. 18, 2022) (quoting *Winston* v. *Mediafare Ent. Corp.*, 777 F.2d 78, 80 (2d Cir. 1985)); *see also Colonia Ins., A.G.* v. *D.B.G. Prop. Corp.*, No. 89 Civ. 8640 (RPP), 1992 WL 204376, at *8 (S.D.N.Y. Aug. 10, 1992) ("Under New York law, the failure of one party to sign an agreement does not immediately render the agreement void and unenforceable."); GLEN BANKS, NEW YORK CONTRACT LAW § 2:8 (2022) ("Where the evidence supports a finding that the parties intended to be bound by an agreement, the agreement will be unenforceable for lack of signature only if the parties positively agreed that the agreement should not be binding until reduced to writing and formally executed."). "In any given case it is the intent of the parties that will determine the time of contract formation." *Barshay*, 2022 WL 170599, at *1 (quoting *Winston*, 777 F.2d at 80). Intent is determined with consideration of "[i] whether there has been an express reservation of the right not to be bound in the absence of a writing; [ii] whether there has been partial performance of the contract; [iii] whether all of the terms of the alleged contract have been agreed upon; and [iv] whether the agreement at issue is the type of contract that is usually committed to writing." *Acun* v. *Merrill Lynch Pierce Fenner & Smith, Inc.*, 852 F. App'x 552, 554 (2d Cir. 2021) (summary order) (quoting *Winston*, 777 F.2d at 80). "No single factor is decisive, but each provides significant guidance." *Id.* (quoting *Ciaramella* v. *Reader's Digest Ass'n, Inc.*, 131 F.3d 320, 323 (2d Cir. 1997)).

14

Defendant is entitled to summary judgment if no reasonable jury could find that he and Plaintiff entered into an agreement to share the profits of Defendant's work with Gotay and Goulbourne.

## B. The Court Denies Defendant's Motion for Summary Judgment

Defendant moves for summary judgment on Plaintiff's breach of contract claim. Because Plaintiff has provided sufficient evidence for a jury to conclude that Defendant manifested an intent to be bound to a written agreement to share 20% of the proceeds of his management of Onfroy and Goulbourne with Plaintiff, the Court denies Defendant's motion.

### 1. A Triable Issue Exists Concerning Whether Defendant Signed the Profit-Sharing Agreement

Defendant argues that he is entitled to summary judgment because (i) he never signed a profit-sharing agreement with Plaintiff via DocuSign (Def. Br. 9-11), and (ii) Defendant's purported signature on the profit-sharing agreement is inadmissible and therefore cannot create a genuine issue of material fact (*id.* at 11-13). *First*, Defendant argues that he is entitled to summary judgment because he never signed a profit-sharing agreement with Plaintiff. (Def. Br. 9-11). He maintains that the signature that appears above his name on the purported agreement (*see* Pl. Decl., Ex. 5), is not his genuine signature and was not added via DocuSign (Def. Br. 9-11). Under New York law, "an assertion that a signature was forged cannot ordinarily be resolved on summary judgment." *Feehan* v. *Feehan*, No. 09 Civ. 7016 (DAB) (THK), 2010 WL 3734082, at *9 (S.D.N.Y. July 26, 2010), *report and recommendation adopted*, 2010 WL 3734079 (S.D.N.Y. Sept. 22, 2010). This is because the

15

authenticity of a document is a fact question for a jury.  *See James* v. *Albank*, 763 N.Y.S.2d 838, 839 (2d Dep't 2003) (finding that competing evidence about genuineness of signature created a fact question); *Brass Constr.* v. *Muller,* No. 98 Civ. 5452 (MBM) (JCF), 2000 WL 791814, at *2 (S.D.N.Y. June 20, 2000) (same); *see also* George L. Blum et al., 75A AM. JUR. 2D, Trial § 652 (2022) ("The authenticity of an instrument is a fact question for resolution by a jury, including the question whether a document was altered after it was signed.  Controverted questions of fact include whether the document was forged and whether the signatures are genuine.").

Defendant argues that he is nonetheless entitled to summary judgment because of the unique circumstances of this case.  In particular, Defendant offers several pieces of evidence to demonstrate that the authenticity *vel non* of his signature is not genuinely disputed.  *See Celotex Corp.*, 477 U.S. at 323 (explaining that the party seeking summary judgment bears the initial burden of demonstrating "the absence of a genuine issue of material fact").  To begin, Defendant submits his own declaration vehemently denying signing the document.  (Def. Decl. ¶ 44 ("I did not sign the Alleged Written Agreement or any agreement, by DocuSign or any other means, with the Plaintiff.")).  He also offers the testimony of an electronic data forensics expert, who reviewed the document and concluded that "the alleged signature of Mr. Sobande … was not placed on the [alleged profit-sharing agreement] via DocuSign."  (Mills Decl. ¶ 11).  According to the expert, DocuSign's verification system was able to validate Plaintiff's signature on the agreement, but not Defendant's.  (*Id.* at

16

¶¶ 26-27).  Finally, Defendant offers an alternative explanation for the texts and emails apparently exchanged between him and Plaintiff that purportedly recognize a profit-sharing agreement:  He says that Plaintiff had access to Defendant's phone and computer at the Elmont studio and could have sent the texts and emails to himself from Defendant's devices (Def. Decl. ¶¶ 7-10, 13-14, 17-18), and that the source of the texts cannot be verified without examining Plaintiff's phone (Mills Decl. ¶¶ 47-48).

Plaintiff offers his own evidence in response.  He attests that he witnessed Defendant sign the agreement electronically.  (Pl. Decl. ¶ 46 ("Defendant also electronically signed the Agreement on Defendant's phone in my presence right after I did.")).  To support his assertion, Plaintiff produced two emails from Defendant's account to Plaintiff's account, one dated March 8, 2017, which included a copy of the draft agreement (Pl. Decl., Ex. 3), and one dated March 14, 2017, which included a copy of the executed agreement (*id.*, Ex. 5); as well as texts purportedly between the two that reference Defendant's intent to sign the agreement and his plans to pay Plaintiff as money came in from the contracts (*id.*, Ex. 4, 6-13).  Plaintiff denies sending these messages to himself from Defendant's email account.  (*Id.* at ¶ 35).

Construing the evidence in the light most favorable to Plaintiff — as the Court must at summary judgment — a reasonable jury could find that Defendant manifested his intent to contract by signing the profit-sharing agreement.  In this regard, the Court credits Defendant's expert's conclusion that DocuSign could not verify Defendant's signature.  *See Estate of Thomas* v.

17

*Fayette County*, 194 F. Supp. 3d 358, 368 n.7 (W.D. Pa. 2016) (listing cases crediting unopposed expert conclusions at summary judgment).  But the expert did *not* opine that the signature could not have otherwise been placed there by Defendant, and the parties did not specify that they would only be bound by DocuSign-verifiable signatures.

Moreover, there is no evidence in the record to suggest that it would have been impossible for Defendant to sign the agreement in Plaintiff's presence, only to discover later that this signature was, for some reason, not verifiable. This scenario is not mere speculation or "some metaphysical doubt as to the material facts."  *See Matsushita*, 475 U.S. at 586.  Rather, it is supported by the texts and emails in which Defendant declared his intent to sign the agreement.  And though Defendant has cast doubt on the authenticity of those communications, he has not proven definitively that he did not send them.[7] Indeed, it is reasonable to infer that Defendant did send them, particularly because he does not deny that the emails were sent from his account.  (*See* Def. Decl. ¶ 8).  Because a jury could reasonably find that Defendant manifested an intent to sign the agreement, summary judgment is not warranted on this basis.

*Second*, Defendant argues that he is entitled to summary judgment because his signature on the profit-sharing agreement is inadmissible and therefore cannot create a genuine issue of material fact.  (Def. Br. 11-13).  *See*

---

[7]     In fact, Defendant's expert says exactly this.  (*See* Mills Decl. ¶¶ 47-48 (concluding that the origin of the text messages produced by Plaintiff cannot be verified without examining the phones from which they were exchanged)).

*Raskin* v. *Wyatt Co.*, 125 F.3d 55, 66 (2d Cir. 1997) ("[O]nly admissible evidence need be considered by the trial court in ruling on a motion for summary judgment."). Evidence is only admissible if it can be authenticated or identified, meaning the proponent of that evidence can "produce evidence sufficient to support a finding that the item is what the proponent claims it is." Fed. R. Evid. 901(a). "[T]he burden of authentication does not require the proponent of the evidence to rule out all possibilities inconsistent with authenticity, or to prove beyond any doubt that the evidence is what it purports to be. Rather, the standard for authentication, and hence for admissibility, is one of reasonable likelihood." *United States* v. *Pluta*, 176 F.3d 43, 49 (2d Cir. 1999) (quoting *United States* v. *Holmquist*, 36 F.3d 154, 168 (1st Cir. 1994)). At summary judgment this burden is "relatively low," *Bazak Int'l Corp.* v. *Tarrant Apparel Grp.*, 378 F. Supp. 2d 377, 391 (S.D.N.Y. 2005), as the Court's role is limited to determining "if sufficient proof has been introduced so that a reasonable juror could find in favor of authenticity or identification." *United States* v. *Ruggiero*, 928 F.2d 1289, 1303 (2d Cir. 1991) (quoting 5 Jack B. Weinstein & Margaret A. Berger, WEINSTEIN'S EVIDENCE § 901(a) (1990)).

The executed agreement proffered by Plaintiff meets this low bar. Defendant claims that Plaintiff cannot authenticate Defendant's signature because he does not know what Defendant's signature looks like, as evidenced by Plaintiff's misidentification of Defendant's signature at his deposition. (Def. Br. 12-13). But "electronic signature technology, in all its forms, looks nothing like a scrawled John Hancock." Michael J. Hays, *The E-Sign Act of 2000: The*

*Triumph of Function over Form in American Contract Law*, 76 NOTRE DAME L. REV. 1183, 1210 (2001).  And Plaintiff offered alternative evidence, detailed above, that the purported agreement contains Defendant's genuine signature: namely, his testimony that he witnessed Defendant sign the agreement, as well as texts and emails in which Defendant appears to have communicated his intent to sign the agreement.  It is ultimately for a jury to decide whether Plaintiff's evidence more credible than Defendant's contrary evidence, but it suffices at this stage to create a material dispute of fact concerning the agreement's authenticity.  *See Bazak Int'l Corp.*, 378 F. Supp. 2d at 392.  In short, given the factual disputes that pervade this case, the Court cannot say as a matter of law that Defendant did not sign the profit-sharing agreement.

> ### 2.      A Triable Issue Exists Concerning Whether Defendant Agreed to be Bound by the Profit-Sharing Agreement Through Partial Performance

Plaintiff's breach of contract claim survives summary judgment for an additional reason.  Under New York law, "[a]n unsigned contract may be enforceable, provided there is objective evidence establishing that the parties intended to be bound."  *Flores* v. *Lower E. Side Serv. Ctr., Inc.*, 4 N.Y.3d 363, 369 (2005).  Partial performance is evidence of such intent.  *Allen* v. *Nat'l Video, Inc.*, 610 F. Supp. 612, 631 (S.D.N.Y. 1985) (determining that contract formation was a fact issue because although party against whom agreement was enforced did not sign written agreement, "the parties otherwise played their parts under the contract"); *see also Barshay*, 2022 WL 170599, at *6 ("Plaintiff alleges that Defendant made two payments to Plaintiff in furtherance

of his obligations under this agreement[.]  That Defendant has made efforts to partially satisfy his obligations under the terms of the alleged agreement stands as strong evidence in favor of the existence of this agreement."); *Asesores y Consejeros Aconsec CIA, S.A.* v. *Glob. Emerging Mkts. N. Am.*, 841 F. Supp. 2d 762, 766-68 (S.D.N.Y. 2012) (concluding after bench trial that client agreed to law firm's services despite failing to sign offered engagement letter because client accepted firm's work).

Whether Defendant manifested his intent to be bound by partially performing his obligations under the profit-sharing agreement presents a second issue for trial.  It is undisputed that Plaintiff received a blank W-9 form from Defendant's email account in early March 2017, less than two weeks before the men purportedly signed the agreement.  (Def. Counter-56.1 ¶ 111). It is also undisputed that Defendant sent Plaintiff at least $33,000 between March and June 2017.  (Def. Decl. ¶¶ 40-41).  Whether that money correlates with payouts from Defendant's management of Onfroy and Goulbourne, as Plaintiff suggests (Pl. Opp. 8-10), or was merely a gift, as Defendant claims (Def. Br. 4-5), is a question for resolution by the ultimate factfinder. Construing the evidence in the light most favorable to Plaintiff, a jury could find that Defendant's actions in early 2017 indicate his unequivocal intent to be bound by his written agreement with Plaintiff.

Defendant argues that he is nonetheless entitled to summary judgment on Plaintiff's breach of contract claim because New York's Statute of Frauds requires agreements for finder's fees to be memorialized in a signed writing.

(Def. Reply 4 n.8 (citing N.Y. Gen. Oblig. Law § 5-701(a)(1), (10))).  Defendant may be correct that the Statute of Frauds is a valid defense to a claim of contract formation through partial performance.  *Compare Flores*, 4 N.Y.3d at 368 ("[A] contract may be valid even if it is not signed by the party to be charged, provided its subject matter does not implicate a statute — such as the [S]tatute of [F]rauds — that imposes such a requirement." (internal citation omitted)), *with Colonia Ins., A.G.*, 1992 WL 204376, at *8 ("[A]n unsigned written agreement may be enforceable *notwithstanding the applicable provision of the New York Statute of Frauds* if the party attempting to enforce the contract shows [partial performance]." (emphasis added)); *see also Mtivity, Inc.* v. *Off. Depot, Inc.*, 525 F. Supp. 3d 433, 443 (E.D.N.Y. 2021) (observing that "New York courts are split on the question of whether the Doctrine of Partial Performance can remove an Agreement from the [Statute of Frauds]" and collecting cases, before concluding that partial performance does *not* exempt an agreement from the Statute of Frauds).  But even if the Statute of Frauds were to bar this type of claim, Defendant would not be entitled to summary judgment.  As explained in depth in the preceding section, whether Defendant signed the written agreement (and consequently, whether the Statute of Frauds is satisfied) remains a genuinely disputed fact.

**CONCLUSION**

For the reasons discussed above, Defendant has failed to demonstrate the absence of genuine disputes of material fact necessary to prevail on a motion for summary judgment. Accordingly, Defendant's motion for summary judgment is DENIED. The Clerk of Court is directed to terminate the motion at docket entry 41. Additionally, as Defendant's motion for oral argument is now moot, the Clerk of Court is directed to terminate the motion at docket entry 47.

The parties are hereby directed to file a joint letter proposing next steps in this litigation on or before **October 14, 2022**.

SO ORDERED.

Dated:      September 28, 2022
            New York, New York

_____
KATHERINE POLK FAILLA
United States District Judge